**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CR-20336-DSL**

**UNITED STATES OF AMERICA**

**v.**

**OSCAR BANDEN BURNS and**
**SCHNAIDER CESAR,**

      **Defendant.**

_____/

**REPLY TO DEFENDANTS' RESPONSES TO**
**GOVERNMENT'S OMNIBUS MOTION IN LIMINE**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this reply to Oscar Banden Burns and Schnaider Cesar's responses (DE146 and DE141, respectively) to the government's Omnibus Motion in Limine (DE123).   First, in opposing admission of Cesar's fleeing and eluding conviction, defendants assume that, to be inextricable intertwined, prior acts must be similar to the charged offense.   This is wrong. Evidence is inextricably intertwined, and therefore not extrinsic, when it completes the story of the crime.   In this case, the conspirators' reasons for choosing Cesar as their getaway driver is a central part of the carjacking.   Relatedly, the prior conviction is admissible under Rule 404(b) because it establishes motive and intent—not just Cesar's motive and intent, but his co-conspirators' as well.   Second, the jury should learn that Burns declared his innocence on a line he knew to be recorded because this fact contextualizes his false exculpatory statements. Knowing that his call was being monitored by the jail gave Burns a powerful reason to lie and use coded language.   Burns's insistence that the call should be taken at "face value" betrays his desire to mislead the jury.

### A. The Fleeing and Eluding Conviction

Cesar argues that his fleeing and eluding conviction is not inextricably intertwined because "there are no facts or circumstances that are similar between Mr. Cesar's prior conviction and the case at bar" (DE141:2).   But inextricably intertwined evidence is not limited to similar circumstances.   Rather, inextricably intertwined evidence "tends to corroborate, explain, or provide necessary context for evidence regarding the charged offense." *United States v. Gay*, 423 F. App'x 873, 876 (citing *United States v. Jimenez*, 224 F.3d 1243, 1249 (11th Cir. 2000)).

For example, in *United States v. Simpkins*, 240 F. App'x 334 (11th Cir. 2007), the defendant and three others were charged with, among other crimes, conspiracy to commit armed bank robbery and bank robbery.   During the trial, the government's cooperator testified that the defendant was the driver in the charged robbery because he had been the gunman in a prior, uncharged robbery but believed he had been undercompensated for the danger associated with serving as the gunman.   The Eleventh Circuit affirmed the district court's admission of this testimony because it was inextricably intertwined with the charged conduct.   As the Court explained, "Here, [the cooperating defendant's] testimony about the prior robbery explained why [the defendant] was asked to participate in the charged robbery and why he was the driver of the getaway car."   240 F. App'x at 340.

Along similar lines, in *United States v. Richardson*, 764 F.2d 1514, 1521 (11th Cir. 1985), the government's cooperator testified that he and the defendant had purchased and distributed cocaine together several times before the conduct charged in the indictment.   Upholding admission under an inextricably intertwined theory, the Eleventh Circuit concluded that the evidence, "explain[ed] why [the cooperating co-conspirator] had turned to [the defendant] rather

2

than some other person to obtain the cocaine." *Id*.   In neither case did the inextricably intertwined analysis hinge on the similarity between the prior conduct and the charged offense.   Instead, the court considered whether the proposed evidence supplied necessary context for the crime, especially the conspirators' motives.

The government anticipates that motive—Cesar's and his co-conspirators' alike—will play a central role at trial.   During the first trial, Cesar presented a mere presence defense, highlighting his supposed lack of motive as support for this claim.   He mounted a kind of mistake argument, asserting that he moved to the driver's seat as a knee-jerk reaction to the carjacking.   The proposed evidence—both Cesar's statement to Blanc and the fleeing and eluding conviction—rebuts this claim.   The government's theory is that Cesar volunteered to serve as the getaway driver, and his co-conspirators agreed, because he possessed the necessary skills to do the job.   In other words, Cesar was not in the wrong place at the wrong time, he was precisely where he and his partners required him to be.

Moreover, Cesar's argument that "Blanc was not involved in the prior offense" is irrelevant.   Here, it is important to separate the conviction and the statement.   The government can prove the fleeing and eluding conviction through certified records.   *United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) ("It is elementary that a conviction is sufficient proof that [defendant] committed the prior act.").   As for Cesar's statement that he had experience "pulling chase," Blanc would be testifying to the boast from firsthand experience.   The exchange shows why Cesar volunteered to serve as getaway driver—and why Blanc and Burns agreed that he should perform this key role.   Whether Burns and Blanc personally observed Cesar fleeing is of

no moment.   And to the extent the defense wishes to press Blanc's truthfulness or his memory of that statement, such matters go to weight, not admissibility.

Cesar also claims that, "[u]nder the Government's theory, even a simple [s]peeding citation would be enough to argue that the evidence should be presented to the jury" (DE141:4).   This slippery slope argument is unpersuasive.   The fact that Cesar has experience driving fast, by itself, may not be enough to admit the evidence, but that is not the government's argument.   Rather, Cesar's prior experience driving fast to escape law enforcement is narrowly tailored to this offense. Not everyone who has experience driving, or driving fast, for that matter, will keep a level head during law enforcement pursuit.   The government's theory is that Cesar and his co-conspirators agreed to have him serve as getaway driver because he had successfully completed this highly specialized task.

A brief hypothetical illustrates the government's point.   Consider a drug trafficking case involving three men arrested on a 50-foot yacht loaded with cocaine.   The government's theory is that the defendant, one of the men aboard the yacht, was the captain, while the other two were load guard and navigator.   If the government sought admission of the defendant's prior Coast Guard citation for speeding in his 45-foot yacht, this evidence would serve two key purposes: first, it would establish the defendant's experience driving large vessels; and, second, it would refute a mere-presence defense by supplying a motive for the defendant's presence on the boat.   In the present case, the advanced evidence tackles the same questions of skill and motive.

Last, Burns's objection that Blanc's proposed testimony "speculates as to Mr. Burns's state of mind" misses the mark.   Blanc could certainly testify about his thought process in trusting Cesar to drive the getaway car.   As for Burns's motives, the government is free to draw reasonable

4

inferences from the evidence presented to the jury.  The government's closing argument is not cabined by Burns's Rule 602 argument.

Because Cesar's fleeing and eluding conviction and subsequent statement to Blanc contextualize and complete the story of the offense, the evidence is inextricably intertwined with the charged offense.  Alternatively, the evidence is admissible under Rule 404(b) because it establishes the conspirators' motives and undercuts Cesar's likely mere presence defense.

### B.  The Recorded Jail Call

On May 20, 2023, a little over two weeks after the carjacking, Burns called his co-conspirator Rayneo Blanc from Metro-West Detention Center ("MDC").  At the top of the call, a prerecorded message warned Burns that his conversation would be recorded by MDC.  When Blanc answered the phone, Burns immediately said, "you already know we ain't gonna talk like that on this phone, but shit wild man you hear me?"  Later, when a new person joined the call, Burns gave him the same warning: "Ay, we can't talk on the phone like that, man, you heard what I'm saying[?]"  Following his own advice, Burns avoided any self-incriminating statements, insisting that he "didn't even do this shit."  To Blanc, he repeated: "we ain't even do shit, you feel what I'm saying?  I ain't even do this, you feel me?"  Burns suspected that there was "spoiled cheese," meaning "somebody telling about something somewhere," because "how I get locked up bro?"  Throughout the call, Burns insisted that he knew nothing about the carjacking and that whoever told police about his involvement in the crime must have been lying.  Blanc, equally careful about the monitored prison line, said that police had not interviewed him about the carjacking, because he didn't "know what's going on."  Burns then replied, "Bingo, and I don't

know what's going on either."   He then tried to coordinate his alibi with Blanc, saying they were both "out of town" in Orlando and had "just [come] back."

Taken in context, the statements the defense response characterizes as "exculpatory" (DE146:1, 4) are obviously lies.   But without the important context of the pre-recorded message— which put Burns on notice that his admissions could incriminate him—the jury would never learn that Burns had a reason to lie.   When someone "simply states that he is innocent" (DE146:2), the jury is entitled to ask themselves why.   The Eleventh Circuit jury instructions encourage juries to ask if a witness has "any particular reason not to tell the truth" or "a personal interest in the outcome of the case[.]" Eleventh Circuit Pattern Jury Instructions, B5 ("Credibility of Witness").   In this case, Burns wishes to exclude his reason for lying.   He should not be permitted to do so.

Taking Burns's statements at face value, the defense concludes that Burns professed himself to be innocent because he was, in fact, innocent (*id.* at 3).   Undoubtedly, they will argue as much to the jury.   But the government has a competing theory; namely, that Burns lied about his innocence and used the call to instruct Blanc, his partner-in-crime, on what to say if approached by police.   This theory rests on the uncontroversial proposition that people who have committed a crime—and wish to avoid justice—will not admit to the offense when they know the prosecuting authorities are listening.   Contrary to the defense's assertion, this interpretation of the evidence is not "speculation," and, in any event, the government is free to argue from facts in evidence.[1]

---

[1] The defense appears confused about the government's motion, arguing that the government cannot introduce its coaching theory through a witness.   That is not the government's ask.   In discussing Burns's coaching tactics, the government was explaining the value of the recorded-warning evidence it wishes to present to the jury.   The requested evidence—*i.e.*, the pre-recorded message notifying Burns that his conversation will be monitored and recorded—contextualizes Burns's comments to Blanc and supports the inference that Burns was engaging in pre-emptive

Crucially, the defense response misapprehends the government's objective in filing the motion in limine. The government seeks only to inform the jury that the defendant knew his conversation was being monitored by law enforcement. Absent a stipulation to that effect, the government must present this fact through the pre-recorded message at the beginning of Burns's jail call. Thus, the government's aim is not to introduce that Burns was jailed, rather, the jury will learn this fact (again, absent stipulation from the defense) because it is intertwined with evidence that proves a different key fact—i.e., that Burns knew he was being recorded and, thus, had every reason to feign ignorance of the crime.

Burns also misunderstands the government's citation to *United States v. Fuertes*, 435 F. App'x 802 (11th Cir. 2011). In *Fuertes*, the district court allowed testimony from a Bureau of Prisons employee concerning the procedures that a federal detention center uses to inform inmates that their telephone calls with non-attorneys will be recorded and monitored. *Fuertes*, 435 F. App'x at 808. On appeal, the defense objected that this testimony was unfairly prejudicial because it made the jury aware of the fact that the defendant was incarcerated when he made those calls. *Id.* at 804. Rejecting that argument, the Eleventh Circuit concluded that the district court "committed no error, plain or otherwise," by admitting the BOP employee's testimony. *Id.* at 809. It explained that the testimony was relevant to authentication and "brief references to a defendant's incarceration do not violate due process if the remarks, when viewed in context, likely had no impact on the jury's decision." *Id.* (citing *United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1985)). This case is materially indistinguishable from *Fuertes*. Here, as in *Fuertes*,

witness coaching. The government would tie these facts together at closing and not, as defense suggests, through a witness's conclusions.

7

the passing reference to Burns's incarceration carries substantial evidentiary weight in that it shows he had a motive to lie—*i.e.*, because his conversation was subject to law enforcement monitoring. Without this necessary context, the jury would be misled into believing the false exculpatory statement.   Moreover, Burns's repeated warnings to other call participants would make no sense.

Because Burns's awareness of the call's recorded status is a key piece of evidence that the jury needs to evaluate his statement, the government should be allowed to introduce the recorded warning at trial.

<div style="margin-left:40%">

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:      /s/ *Yeney Hernandez*
         YENEY HERNANDEZ
         Assistant United States Attorney
         Court ID No. A5502300
         99 Northeast 4th Street
         Miami, Florida 33132-2111
         Tel.: (305) 961-9277
         Fax: (305) 530-7976
         Email: Yeney.Hernandez@usdoj.gov

</div>

**<u>CERTIFICATE OF SERVICE</u>**

    **I HEREBY CERTIFY** that on December 2, 2024, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF.


                                   */s/Yeney Hernandez*
                                   Assistant United States Attorney

9